FREDERICA E. WHEAT *et al.*, Plaintiffs-Appellants, *v.* JOHN C. MARCIN, City Clerk of the City of Chicago, *et al.*, Defendants-Appellees.

First District (3rd Division)   No. 61589

Opinion filed September 16, 1976.

Morton Siegel and Allan Goldberg, both of Chicago, for appellants.

William R. Quinlan, Corporation Counsel, of Chicago (Daniel Pascale and Lucia T. Thomas, Assistant Corporation Counsel, of counsel), for appellees.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

This suit was brought to enjoin the Chicago Board of Election Commissioners from submitting a referendum to the voters in the 23rd precinct, 7th ward concerning the sale of liquor in that precinct. The injunction was denied and the court ordered the proposition placed on the ballot.

On September 6, 1974, a petition consisting of 18 pages of signatures

and addresses was filed with John C. Marcin, City Clerk, Chicago. The petitioners requested that in the general election on November 5, 1974, the voters of the precinct be asked to vote on the following proposition: "Shall the Sale at Retail of Alcoholic Liquor containing more than 4% of Alcohol by weight except in the original package and not for consumption on the premises be prohibited in this 23rd Precinct of the 7th Ward of the City of Chicago?" On September 9 Marcin certified to the Board of Election Commissioners that the petition complied with the requirements of article IX, section 2 of the Liquor Control Act (Ill. Rev. Stat. 1973, ch. 43, par. 167) which is captioned "Referendum on retail sales of alcoholic liquor—Petition—Procedure."

About two weeks later, several of the precinct's registered voters sought to prevent the proposition from being placed on the ballot. Among other things, they alleged that the petition failed to comply with section 2 in that it contained numerous forgeries and irregularities.

A special commissioner was appointed to determine the validity of the challenged signatures. He related his findings at the trial (which were agreed to by stipulation) that in October 1972 (the month in which the last general election was held prior to the filing of the petition) there were 607 registered voters in the precinct; that the petition contained 165 signatures; and that section 2 required only 152 signatures—*i.e.*, 25% of the 607 voters registered in the last general election. He also reported that, based on the analysis of a handwriting expert who examined the petition, 16 of the signatures were signed by a person other than the voter whose name appeared on the registration card.

Of these 16, six were validated as not being forged after the signers came into court and identified the signatures as their own. The remaining 10 were never validated and were considered forged. This left only 155 (165-10) signatures. Of these 155, one was eliminated after the voter who supposedly signed the petition said in court that he never did. This left 154 valid signatures. But three of these were challenged on the ground that they were signatures of persons whose names appeared on the October 1972 poll list but whose registrations had been cancelled in February 1974. The court considered the objectors' contention that these three signatures should be stricken, but decided that they should not.

The plaintiff-objectors appeal this ruling and point to the following statutory provisions:

"The words and phrases defined in this section and used in this Article, unless inconsistent with the context, shall be construed as follows:

\* \* \*

'Legal voter', insofar as the signing of a petition for a local election is concerned, means a person whose name appears on the

poll list of the last general election of county or state officers." Ill. Rev. Stat. 1973, ch. 43, par. 166.

"When any legal voters of a precinct in any city * * * desire to pass upon the question of whether the sale at retail of alcoholic liquor shall be prohibited in the precinct, they shall, at least 60 days before an election, file in the office of the clerk of such city * * * a petition * * * containing the signatures of not less than 25% of the legal voters registered * * * from the precinct." (Ill. Rev. Stat. 1973, ch. 43, par. 167.)

Section 2 of article IX of the Act requires that local option petitions be signed by a quarter of the precinct's registered legal voters. The objectors' argument is that this means currently registered voters and that an individual, whose name appeared on the poll list of the last general election but whose registration has been subsequently cancelled, is ineligible to sign such petitions.

■■ Section 1 of article IX (Ill. Rev. Stat. 1973, ch. 43, par. 166) requires that its definition of "legal voter" shall be followed unless this would be inconsistent with the context of the statute. We see nothing inconsistent in using this definition—a person who was registered for the last general election—in section 2. Certainly, there is nothing in that section which specifically indicates that petition signers must be currently registered voters. In the absence of language which would render the application of the section 1 definition of "legal voter" inconsistent, we hold that it should apply and that, as a result, section 2 should be construed to permit voters who presently reside in the precinct and who were registered for the preceding general election to sign local option petitions.

The one case the plaintiffs have cited against this proposition is clearly distinguishable. (*Roesch v. Henry* (1909), 54 Ore. 230, 103 P.439.) An Oregon statute ordered the county clerk upon receipt of a local option, "wet/dry" petition to "compare the signatures of the electors signing the same with their signatures on the registration books of the election then pending, or if none pending, then with the signatures on the registration books and blanks on file in his office for the preceding general election." The implication of this language was obvious—that a legal voter could validly sign the petition if he was currently registered for the pending election; but if there was no pending election, he had only to be a legal voter registered for the preceding general election. The difference between the Oregon statute and section 2 is that there is no language in the Illinois provision specifically stating what registrations the clerk should check and none leading to the conclusion, obvious in *Roesch,* that only currently registered voters may sign a local option petition for a pending election.

The plaintiffs also claim that the circulators of the petition violated part of section 4 of article IX (Ill. Rev. Stat. 1973, ch. 43, par. 169):

> "No signature shall be valid or be counted in considering the petition unless the form requirements are complied with * * * . At the bottom of each sheet of the petition there shall be added a statement, signed by a resident of the particular precinct or political subdivision of the State which is affected by the petition with his residence address, stating that the signatures on that sheet of the petition are genuine, and that to the best of his knowledge and belief the persons signing the petition were at the time of signing, legal voters in the * * * precinct * * * that their respective residences are correctly stated therein and that each signer signed the petition on the date set opposite his name.* * *"

The petition was circulated by Cecelia Seals and Leila McMillan. Mrs. Seals testified that she personally asked each person whose name appeared on the sheets circulated by her to sign the petition. She stated that she first examined the names and addresses on the October 1972 voter registration list and then went door-to-door seeking signatures. She identified herself as Mrs. Cecelia Seals for the Citizens of the Safer South Shore and explained the purpose of the petition: to have placed on the ballot a proposition which, if passed, would restrict the number of taverns in the community. Although she sometimes asked the person who came to the door if he had a voter's registration card, she explained that she never asked for any additional identification and that she assumed that when the person answering the door identified himself as the voter on the poll list, that the two were the same. After the signatures were obtained she went over all her petition sheets to make sure that the signers were within the precinct and registered as of October 1972. Other sheets of the petition were circulated and checked in essentially the same manner by Mrs. McMillan.

■■ It is the plaintiffs' contention that the two circulators failed to exercise the caution in identifying the voter status of the petition signers as required by section 4. They argue that petition circulators should ask for more individual identification such as a driver's license or a credit card. But section 4 does not require a procedure so stringent and comprehensive. That provision centers on the mental state of the circulator and requires that the circulator sign a statement on each sheet of the petition that the "signatures * * * are genuine, and that to the best of his knowledge and belief the persons signing the petition were at the time of signing, legal voters in the * * * precinct * * *." The statute further provides: "Whoever in making the sworn statement above prescribed shall knowingly and wilfully swear falsely, shall be guilty of perjury and on conviction shall be punished accordingly. * * *" Both

Mrs. Seals and Mrs. McMillan signed the statement and testified that, when they did so, to the best of their knowledge and belief the signatures were genuine.

The trial court believed their testimony and concluded that a circulator could reasonably presume that a person living at a certain address who identified himself as the voter on the poll sheet at that address was, in fact, that person and that a circulator had no obligation to get further identification. With this conclusion we agree. The judgment is affirmed.

Judgment affirmed.

MEJDA, P. J., and McNAMARA, J., concur.